612 So.2d 308 (1992)
STATE of Louisiana
v.
Gregory LEEMING.
No. 92-KA-642.
Court of Appeal of Louisiana, Fifth Circuit.
December 29, 1992.
Writ Denied April 12, 1993.
*309 John M. Mamoulides, Dist. Atty., Ronald Bodenhemer, Leigh Anne Wall, Asst. Dist. Attys., Gretna, for plaintiff/appellee.
Bruce G. Whittaker, Indigent Defender Bd., Gretna, for defendant/appellant.
BOWES, DUFRESNE and GOTHARD, JJ.
GOTHARD, Judge.
On January 17, 1991, the Grand Jurors of Jefferson Parish returned an indictment charging defendant, Gregory Leeming, with the second degree murder of Caroline Alford. The defendant was arraigned on January 25, 1991 and pled not guilty. After the court conducted a sanity hearing and found him competent to assist counsel in his own defense, the defendant withdrew his plea and entered a plea of not guilty and not guilty by reason of insanity. The issue of whether the defendant was able to discern right from wrong at the time of the offense was deferred to the time of trial for the jury's consideration.
A motion to suppress the confession was denied and the matter proceeded to trial. After a six day trial in December, 1991, the jury returned a verdict of guilty as charged. A motion for new trial was heard and denied on February 20, 1992. Subsequently, the trial court sentenced the defendant to a mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence in accordance with LSA-R.S. 14:30.1. The defendant filed a timely motion for appeal.
FACTS:
On December 30, 1990, members of the Jefferson Parish Sheriff's Office responded to a report of a possible homicide at the Candlelight Inn on Airline Highway. Sergeant Kenneth Davis, Deputy Michael Carrone and Detective Steve Kolb were the first three officers to arrive at the scene. Upon their arrival, they met with the owner *310 of the motel, who advised them that he noticed some blood on the curtains in a particular room. The officers proceeded to the room, observed the blood on the curtains, and knocked on the door. The defendant opened the door and was placed against the wall by Deputy Carrone. Sergeant Davis entered the room and discovered the bloody body of a woman on the floor. The officers handcuffed the defendant and removed him from the room. At that point the defendant was advised of his constitutional rights and indicated to Deputy Carrone that he fully understood those rights.
Despite the officers' caution to remain silent until detectives arrived, the defendant freely spoke about the murder and his motivation. He told officers that he killed Caroline Alford because he was tired of being "ripped off" by her and that he intended to call the police after the football game he was watching on television was over.
The defendant was taken to police headquarters where he was again advised of his rights. He stated that he understood those rights. He read and signed a waiver of rights form and expressed a desire to make a statement.
In that statement the defendant explained that he recently returned to New Orleans from California where he had resided for the past few years. He intended to resume his employment as an offshore cook in about one week. He checked into the Candlelight Inn on Christmas day. He was familiar with that establishment and knew several individuals who frequented the place. He stated that he had known Ms. Alford in 1986 before he moved to California. On the day of the murder defendant met Ms. Alford at the Poppa Bear Bar in the Candlelight Inn. They went up to his room and engaged in sexual activity. The defendant accused Ms. Alford of stealing $140.00, a shirt and a watch from him a few days earlier. He said he was tired of being "ripped off" so he decided to kill her. He explained in detail how he cut her throat and stabbed her with one of the knives he uses in his profession as a cook. He also stated that she asked him to help her after the stabbing but he told her, "I can't help you no more. It's over."
After she died the defendant cleaned up some of the blood with towels in the room and changed his clothes. He then went out to the store to purchase a 12-pack of beer. He returned to his room and drank two of the beers and began watching a football game. He remained in the room until officers arrived.
When asked why he committed the murder, the defendant stated that he was angry with Ms. Alford for stealing from him and he wanted to "prove a point" to prostitutes who steal and do cocaine.
On appeal defendant assigns four errors. The first two center around the affirmative defense of intoxication. Specifically, defendant argues that his level of intoxication prevented him from forming the requisite intent for second degree murder and from giving a knowing and voluntary confession.
We shall consider the defense of intoxication as it relates to the validity of the confession first. At the motion to suppress the confession the following testimony was presented.
Deputy Carrone who was one of the first officers on the scene of the murder testified to the events as previously stated in this opinion and further testified that, none of the officers threatened or promised the defendant anything for the waiver of his rights. Deputy Carrone stated that the defendant appeared to offer his statement knowingly, freely and voluntarily.
On cross-examination, Carrone testified that defendant appeared healthy and normal. In addition, defendant did not smell of alcohol, although he did ask for a beer once he was removed from the room. According to Carrone, defendant did not stumble when he walked. He appeared to be very casual and relaxed and exhibited no traits of aggression or hostility. The officer further testified that while on the scene, defendant started to tell him what had happened; however the officer advised defendant to wait until the detectives arrived to talk to them.
*311 In the last portion of his testimony, Carrone testified that defendant did not exhibit any traits of a person who was intoxicated and that defendant was oriented as to date and place. However, the officer admitted that no breath or blood testing was performed to ascertain defendant's alcohol level.
Lieutenant Steve Buras, commander of the homicide division of the Jefferson Parish Sheriff's Office, testified that on December 30, 1990, at approximately 1:00 p.m., he responded to a call from the Candlelight Inn. Upon his arrival on the scene, he was informed by other deputies that the suspect in the killing had made some admissions. Lieutenant Buras then instructed the officers to transport defendant to First District Lock-up. After reviewing the scene, Buras proceeded to the station and conducted an interview with defendant. Prior to conducting the interview, Lieutenant Buras advised defendant of his rights, and then let defendant read the rights himself. Defendant signed his initials, acknowledging that he read each right and then signed the waiver of rights form. Defendant subsequently gave the officer a taped statement which was later transcribed. According to Buras, defendant did not appear intoxicated and seemed to understand his rights.
On cross-examination, Buras testified that when he initially met defendant at the station, defendant advised Buras that he remembered giving statements to the deputies on the scene and thought it would be in his best interest to provide the officers with a detailed statement of what had taken place. When defense counsel questioned Buras about his knowledge of defendant's alcohol consumption, the officer testified that the only comment made to him was that defendant had two beers after the killing. Buras admitted that he did not order any tests to determine the alcohol content in defendant's blood.
Detective Steve Kolb also testified. He confirmed Deputy Carrone's recitation of the facts surrounding the murder investigation. Detective Kolb testified that the defendant appeared to be oriented as to time and place and did not appear drunk; although Detective Kolb admitted on cross-examination that he smelled alcohol when the defendant spoke to him.
Sergeant Kenneth Davis testified that he proceeded to the crime scene after being advised by a radio supervisor that she received a call from a man out of state who told her that his brother had just murdered someone. Sergeant Davis was present when defendant's motel room was entered. According to Davis, defendant did not give the officers any trouble, and in fact, was fully dressed watching a football game. Although Davis could not say whether he smelled alcohol on defendant, he noticed that there were some beer cans in the room. The officer described defendant's demeanor as "very cold." He also testified that defendant was talkative but calm and appeared to know what he was doing at all times.
After considering the testimony presented, the trial court concluded that defendant was properly advised of his constitutional rights and that he made a knowing and voluntary waiver of those rights. Accordingly, the court denied the motion to suppress.
During the course of the trial, defense counsel re-urged his motion to suppress which was again denied. This was based upon the discovery that when booked at the police station, less than half an hour before the taking of the defendant's statement, the booking officer noted that the suspect appeared to be under the influence of alcohol.
Before a confession can be introduced into evidence, the State has the burden of proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.[1] LSA-C.Cr.P. *312 art. 703(D); LSA-R.S. 15:451; State v. Vaccaro, 411 So.2d 415 (La.1982). It must also be established that an accused who makes a confession during a custodial interrogation was first advised of his constitutional rights as per Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and voluntarily and intelligently waived those rights. State v. Castillo, 389 So.2d 1307 (La.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990).
In State v. Robinson, 384 So.2d 332 (La. 1980), the Louisiana Supreme Court set forth the law regarding an inculpatory response or confession which has been challenged on the ground that the accused was intoxicated at the time of the interrogation. In Robinson, the Louisiana Supreme Court stated at p. 335 as follows:
Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. State v. Rankin, 357 So.2d 803 (La.1978).
See also State v. Vinet, 466 So.2d 544 (La.App. 5th Cir.1985).
The issue of whether a showing of voluntariness has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. The trial judge must consider the "totality of the circumstances" in deciding whether the confession is admissible. State v. Shepherd, 449 So.2d 1120, 1123 (La.App. 5th Cir.1984). The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of testimony relating to the voluntariness of a confession are entitled to great weight and will not be overturned on appeal unless they are not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Weiland, supra; State v. Delaune, 572 So.2d 652 (La.App. 5th Cir.1990).
In the present case, the issue of the voluntariness of the confession and the degree of defendant's intoxication turns on the credibility of the witnesses. The testimony of Officers Buras and Kolb, who were present during the statement, show that defendant was advised of his constitutional rights, seemed to understand those rights, and then chose to waive them. According to the officers, no one threatened defendant or promised him anything in exchange for the statement. Moreover, the officers testified that defendant did not appear to be intoxicated either at the scene of the arrest or at the time of the taking of his statement, that defendant appeared to be lucid, and that defendant was oriented as to time and place.
In addition, defendant, at the beginning of the taped statement, acknowledged that he was advised of his rights and chose voluntarily to give a statement to police. In defendant's statement, he was able to describe the events that took place, the time frame surrounding those events, how he killed the victim with a knife, and how many times he stabbed her. Defendant also described his reasons for killing her. Defendant further stated that he knew he would have to do some time for the murder, and that he planned to call the police after the football game. In his statement, defendant told the officers that although he was an alcoholic, he was not "under the influence" of alcohol at the time of the statement. He told the officers that he had two beers that morning.
The fact that defendant was not intoxicated during this time frame is further supported by the evidence that after the killing, he was able to shower, change his clothes and clean up some of the blood in the room. Further, he was able to go to the store to buy some beer and a newspaper.
*313 Although Michael Murphy, the booking officer, testified at trial that defendant appeared to be under the influence at the time he was brought in, he did not note, in the appropriate subcategories, that defendant was confused or unconscious, nor did he note that defendant staggered or had slurred speech.
Despite some of the testimony at trial that defendant may have been intoxicated at the time of the crime and at the time of the taped statement, there was an abundance of contrary evidence. Since this issue involves a credibility call, we cannot say that the trial judge abused his discretion in denying defendant's motion to suppress.
This assignment is meritless.
As to defendant's argument that his degree of intoxication precluded him from forming the requisite intent to commit second degree murder we note that LSA-R.S. 14:30.1 A(1) defines the offense as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm."
Specific intent exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Specific intent is a state of mind and, as such, need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Graham, 420 So.2d 1126 (La.1982); State v. Edge, 504 So.2d 1169 (La.App. 5th Cir.1987), writ denied, 507 So.2d 226 (La.1987). The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard. State v. Huizar, 414 So.2d 741 (La. 1982).
Voluntary intoxication can be material when the circumstances indicate that the intoxication precluded the presence of a specific criminal intent. LSA-R.S. 14:15. Intoxication is in the nature of an affirmative defense to a criminal charge and the burden is upon the defendant to prove the existence of that condition at the time of the offense. Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact. State v. Freeman, 517 So.2d 390 (La.App. 5th Cir. 1987).
At trial Sergeant Davis, Deputy Carrone and Detective Kolb testified for the state. All three officers were present at the scene of the murder. They all agreed that the defendant did not appear to be intoxicated. He was not stumbling, glassy-eyed or confused. His speech was not slurred and he was oriented as to time and place. He gave officers a detailed account of the murder as well as events before and after the murder. They also agreed that the defendant did not tell officers that he was intoxicated; although, he did ask for a beer. Detective Kolb admitted he smelled a faint odor of alcohol. The other two officers testified that they did not smell alcohol.
Lieutenant Buras arrived at the scene later and took defendant's statement after he had been transported to the First District Police Station in Jefferson Parish. Detective Kolb was present when Lieutenant Buras read and explained defendant's rights. Lieutenant Buras stated that the defendant did not appear intoxicated and seemed to understand the rights form after reading it.
The defense offered testimony from various medical professionals to show that defendant is an alcoholic. He is also described as a borderline personality insofar as he uses alcohol as a way to medicate his feelings of anxiety, mistrust of others, depression and low self-esteem.
Tracy Hall, a bartender at the Poppa Bear Bar, testified that the defendant came into the bar on the night of the murder at about 10:00 p.m. The defendant was drinking. He originally had a glass of milk, then a beer and later several shots of vodka. Hall stated that during the course of the evening the defendant played the jukebox and danced. At about 3:00 or 3:30 a.m. the victim came into the bar and ordered a vodka on the rocks. The defendant paid *314 for her drink and purchased one for himself. The defendant and the victim sat together and engaged in what appeared to be a normal conversation. Hall noticed about thirty minutes later that both the defendant and the victim had left the bar, but he could not be sure if they left together.
Hall described defendant's condition as a "buzz." He testified that it was his policy not to serve alcohol to someone who is drunk. Hall said that, although the defendant "had a buzz on," he would be served because he was not driving. Further, Hall testified that the defendant was capable of walking to the jukebox. He was not stumbling. He was able to count out the correct amount of money to pay the bartender.
In the present case, the jury obviously concluded that the defendant had the requisite specific intent, despite his claim that his level of intoxication precluded the formation of such intent. A review of the evidence supports the jury's conclusion. The testimony of the officers indicates that defendant was not intoxicated when they arrived at the scene. In fact, he had cleaned up and was fully dressed as if waiting for them to arrive. Defendant appeared coherent and told the officers the details of what had happened, even though they told him to be quiet until the detectives arrived. Once at the station, defendant was informed of his rights and signed a waiver of rights form. He then gave a taped statement admitting to the murder. Defendant was able to recall the details of what he had done and specifically told the officers that he took the lady to his room purposely to kill her. Defendant did not tell officers that he was intoxicated, or that he suffered a black out at the time of the incident so as to be unable to recall the details. Moreover, at some point after the killing, defendant was able to leave his motel room to go to the store to buy some beer and a newspaper. His specific intent is also evidenced by his statement to police that he knew he would have to do some time for what he did.
Given the testimony regarding the events prior to and subsequent to the murder we cannot say the jury, as triers of fact, were irrational in rejecting defendant's argument that he was too intoxicated to form the specific intent for second degree murder. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This assignment lacks merit.
In his third assignment of error defendant argues that the trial court should have included within its charge to the jury an explanation of the consequences of a verdict of not guilty by reason of insanity.
At a bench conference prior to closing arguments the trial court reviewed the proposed jury charges with counsel. Defense counsel made an oral request at that time that the charge include those articles of the Code of Criminal Procedure which pertain to the disposition of a defendant found guilty by reason of insanity. The trial court denied the request because it was not presented to the court in writing prior to argument.
LSA-C.Cr.P. art. 803 provides that "when a defendant has specially pleaded insanity in accordance with article 552, the court shall charge the jury with respect to the law applicable thereto."
In the present case, the trial judge gave the following instructions regarding the law on insanity:
In this case the defendant has entered the plea of not guilty and not guilty by reason of insanity. Because of such a plea you must first determine if the defendant committed the offense charged or a responsive offense. Unless you find beyond a reasonable doubt that the defendant committed the offense charged or a responsive offense you must find him not guilty. If you find beyond a reasonable doubt that the defendant committed the offense charged or a lesser or a responsive offense then you must determine if he was insane at the time that the offense was committed. The defendant has the burden of proving his insanity at the time of the commission of the offense by a preponderance of the evidence. Thus, the defendant must establish that it is more probable than not that he was insane at the time of the commission *315 of the crime. Insanity at the time of the commission of the crime exempts the offender from criminal responsibility. If the circumstances indicate that because of the mental disease or mental defect the defendant was incapable of distinguishing between right and wrong with reference to the conduct in question, the defendant must be found not guilty by reason of insanity. In determining the question of the sanity or insanity of the defendant at the time of the commission of the offense you must consider all of the evidence bearing on the defendants mental condition including the testimony of experts and of other witnesses and the conduct and actions of the defendant. Thus, if you find one that the State proved beyond a reasonable doubt that the defendant did commit the offense charged or a responsive offense and two that the defendant establish by a preponderance of the evidence that he was unable to distinguish right from wrong with respect to the conduct in question at the time of the offense then your verdict must be not guilty by reason of insanity.
Instruction explaining the consequences of a verdict of not guilty by reason of insanity must be given if requested by defendant or jurors. State v. Babin, 319 So.2d 367 (La.1975) appeal after remand, 336 So.2d 780 (La.1976).
In the present case since the instructions requested by defendant were not included within the court's general charge, defense counsel, pursuant to LSA-C.Cr.P. art. 807, could have specifically requested the charges. Art. 807 provides a right to submit special written charges for the jury before argument. Defendant did not submit such charges in writing. It has been held that when a special jury charge is not reduced to writing for presentation to the court, a trial judge may properly refuse to give such a charge. State v. Weems, 358 So.2d 285 (La.1978).
Even assuming the trial judge erred in failing to give the special requested charges, it has been held that failure to give a requested charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Pettaway, 450 So.2d 1345 (La.App. 2nd Cir.1984), writ denied, 456 So.2d 171 (La.1984). Given the overwhelming evidence which supports defendant's guilt including his specific intent to kill or inflict great bodily harm, we do not find that the failure to give the requested charges prejudiced the defendant.
In his final assignment of error defendant requests a review of the record for errors patent. We have made such a review and have found that the commitment, minute entry and transcript all fail to show that the defendant was given credit for time served. Although we note that the defendant was sentenced to the mandatory life imprisonment without benefit of parole, probation or suspension of sentence, we must amend the commitment and minute entry to reflect credit for time served in accordance with LSA-C.Cr.P. art. 880.
For the foregoing reasons the defendant's conviction and sentence are affirmed and the minute entry of sentencing and the commitment are amended in accordance with this opinion.
AFFIRMED.
NOTES
[1] In State v. Panepinto, 548 So.2d 34 (La.App. 5th Cir.1989), writ denied, 551 So.2d 1335 (La. 1989), a panel of this Court noted that "While the State clearly has the burden to prove beyond a reasonable doubt that the confession was free and voluntary at an admissibility hearing, that burden becomes one `affirmatively proving' the confession as free and voluntary when it is offered for the jury's consideration."